JAMES HUGHES, Respondent, *v.* THE SUN MUTUAL INSURANCE COMPANY, Appellant.

The D. L. & W. R. R. Co. shipped on board a boat owned by plaintiff a load of coal which by the bill of lading he agreed to transport to N. H. and deliver to the consignees " or their assigns (dangers of the sea excepted), they paying freight." While *en route* and in tow of another vessel a storm arose, the boat was cast loose, and the captain having attached a buoy to her, left her and she sank. The boat and cargo were insured in separate companies, the latter by defendant. Plaintiff notified the insurers of the " misfortune," claiming a total loss ; his policy, however, provided that the insured should not have a right to abandon the boat, except in case of absolute total loss, and that the acts of the parties in saving the property insured, in case of disaster, should not be con-

sidered as a waiver or acceptance of an abandonment, but should "be considered as done for the benefit of all concerned and without prejudice to the rights of either party." The insurers refused to receive the loss and notified plaintiff that they intended to raise the boat. The owners of the coal "sold, abandoned and set over" their interest in it to defendant; which company, in connection with the insurer of the boat, entered into a contract with a wrecking company, by which the latter agreed to raise the boat and cargo and deliver them alongside dock in N. H. for a sum specified. The contract was performed by the wrecking company, save a few tons of coal on deck, which were lost, and plaintiff was notified by the insurer of the boat to go to N. H. and take charge of it. The loss was treated and settled as a partial one, and plaintiff paid the expense of recovery. He notified defendant of his claim for freight and forbade the removal of the cargo until it was paid. The defendant, however, removed and sold the coal. In an action for a conversion of the coal, plaintiff's complaint was dismissed. *Held* (RUGER, Ch. J., EARL and FINCH, JJ., dissenting) error; that as payment of freight was made a condition of delivery, the cargo became bound, until, by some default or some event which put an end to the voyage, it became impossible to fulfill the contract, and as the coal in fact reached the port of destination, the contract to carry was apparently fulfilled by plaintiff, and that for delivery would have been, but for the interference of defendant; that neither it nor the original owner of the coal had the right to take it until payment of freight; that an abandonment of the cargo by the shipper could not affect the boat, and as to it there was no abandonment consummated; that the voyage was not lost, and under the stipulations of the policy the recovery of the boat must be considered for the benefit and on account of the owner; that unless voluntarily relinquished by plaintiff, the legal possession which he had of the cargo continued after the accident; and at most the question as to whether or not there was such a relinquishment was one of fact for the jury.

(Argued June 11, 1885 ; decided October 6, 1885.)

APPEAL from order of the General Term of the Court of Common Pleas in and for the city and county of New York, made March 15, 1883, which reversed a judgment in favor of defendant, entered upon an order nonsuiting plaintiff on trial.

The nature of the action and the material facts are stated in the opinion.

*II. Kettell*, for appellant. Under a bill of lading, there must be delivery at destination. (69 N. Y. 234.) No promise to pay *pro rata* freight can be implied in this case. (*Dunnett* v.

*Tomhagen,* 3 Johns. 154; *Wallerstein* v. *Columbia Ins. Co.,* 44 N. Y. 211; 3 Kent, 320, and notes; 69 N. Y. 236; 9 Johns. 189; 2 Bosw. 204.) There was no voluntary acceptance of the coal. (69 N. Y. 236; 9 Johns. 188, 191.) The securing by an insurer of his salvage is a very different thing from taking of cargo by a consignee, and the two cases are distinguished in the books. Insurers are never liable for freight. (*Marine Ins. Co.* v. *U. Ins.,* 9 Johns. 190; 24 N. Y. 454.) The mere fact that the coal reached New Haven is not enough. Salvage service does not entitle the ship-owner to freight. (*Wallerstein* v. *Col. Ins. Co.,* 44 N. Y. 217.) Assuming a right to freight, plaintiff cannot maintain the action because he had not possession of the coal, actual or constructive, and had no right to the immediate possession. (81 N. Y. 290; *Goulet* v. *Asseler,* 22 id. 225; *Hill* v. *Carnley,* 11 id. 501; 17 id. 202; *Manning* v. *Monaghan,* 28 id. 585; 1 Chitty's Pl. 154, 169; *Walker* v. *McNaughton,* 16 Vt. 388.) The principles of law applicable have not been changed by the Code, and plaintiff cannot in any form complain of a taking and sale where he had no right to the possession of the property. (*Goulet* v. *Asseler,* 22 N. Y. 238; *Manning* v. *Monaghan,* 28 id. 589; *Hale* v. *Omaha Nat. Bk.,* 49 id. 631.) In this case the shippers of the coal are liable. (*McKibbin* v. *Peck,* 39 N. Y. 262.) The coal sold to pay the salvage expenses could not be charged with freight. (*Atlantic Mut. Ins. Co,* v. *Bird,* 2 Bosw. 204; *Daniels* v. *Atlantic Mut. Ins. Co.,* 24 N. Y. 453.)

*Edward D. McCarthy* for respondent. If the owner of the cargo in a vessel takes it, the carrier's action can only be maintained for the conversion of his own lien for freight; that is to say, for his special interest in the cargo; but as against any or all other persons who take or intermeddle with it, the action must be brought for the conversion of the whole property. (*Morgan* v. *Condon,* 4 Comst. 552; *Bailey* v. *Shaw,* 4 Foster, 297; *White* v. *Vann,* 6 Humph. 70; *Little* v. *Fossett,* 34 Me. 545; *Ely* v. *Ehle,* 3 Comst. 506; *The Propeller Commerce,* 1 Black, 574; *Merrick* v. *Brainard,* 38 Barb. 574; *H.*

R. R. R. Co. v. *Lounsberry*, 25 id. 597; *Wooley* v. *Edson*, 36 Vt. 214; *Tuthill* v. *Wheeler*, 6 Barb. 364; *Benjamin* v. *Stremple*, 13 Ill. 466; 1 Hill. on Torts, 522, note.) Under the old forms of action trespass was the proper and peculiar form of action to bring. (*Ely* v. *Ehle*, 3 Comst. 506.) If, at the time the wrongful act was done, the plaintiff was in possession of the cargo, either actual or constructive, he can maintain this action. He can recover for the full value of the cargo, unless the defendant was the general owner, or had been subrogated to the rights of the general owner. As against the owner he can recover for the value of his lien or special property in the cargo. (*Benjamin* v. *Stremple*, 13 Ill. 466; *Tuthill* v. *Wheeler*, 6 Barb. 364; 1 Hill. on Torts, 522, note; Story on Bail. [7th ed.], § 588; *Hunt* v. *Haskell*, 24 Me. 329; *Sullivan* v. *Park*, 33 id. 438; *Smith* v. *Wright*, 15 Barb. 51; *McKibben* v. *Peck*, 39 N. Y. 262; *Hubbell's Case*, 74 id. 246; *O'Donovan* v. *Two hundred and forty Tons of Coal*, 8 Fed. Rep'r, 368.) Plaintiff, having completed his contract, acquired a full and perfect lien in the cargo, of which no one, not even the true owner, could deprive him. And against every one but the true owner he was entitled to recover for the full value of the property. (*Sprague* v. *Hosmer*, 82 N. Y. 466.) On the facts proved as between shipper and consignee, the law presumes that the consignee was the owner. (*Potter* v. *Lansing*, 1 Johns. 215; *Lawrence* v. *Minturn*, 17 How. [U. S.] 100.) And as between the carrier and the owner of the cargo, the carrier's lien would have taken precedence of the wrecker's lien, even had the latter not been satisfied by full payment. (*Hubbell's Case*, 74 N. Y. 257.)

DANFORTH, J. The complaint states that in November, 1881, the plaintiff as a common carrier and owner of the boat "*Arizona*," had, upon it and in his possession, coal of the value of $1,000, which he had carried from New York to New Haven on freight; that the defendant, a domestic corporation, by violence took it from the boat.

The answer of defendant admits its corporate character,

but denies the other allegations. It also set up new matter, but no question arises on the pleadings.

On the trial of the issues before a judge and jury, the character and ownership of the plaintiff was proved, and that the coal, in all two hundred and seventy-three tons, including seventeen on deck, was shipped under a bill of lading by the D., L. & W. Railroad Company "for account of R. H. Williams & Co." of New Haven, and to be delivered to them "or their assigns (dangers of the seas excepted), they paying freight at the rate of seventy cents per ton." While on the voyage and near New Haven a heavy storm was encountered, and the captain having first tied "a big buoy to the end of the boat, and located her where she would be easily found," left the boat and it sunk.

The boat and cargo were insured; the boat by the Buffalo Insurance Company; and in pursuance of the terms of the policy the owner notified them of the "misfortune," claiming a total loss. But the policy provided that the insured should "not have a right to abandon the vessel, except in the case of an absolute total loss," and that "the acts of the insured or insurers, or their agents, in recovering, saving and preserving the property insured, in case of disaster, shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy, *but such acts shall be considered as done for the benefit of all concerned, and without prejudice to the rights of either party.*"

Under these provisions the insurers refused to receive the loss, and in reply to the owner's notice, informed him that they intended to raise the boat.

The defendant insured the cargo on account of the D., L. & W. Railroad Co., and they, in consideration of the payment of its value, "sold, abandoned and set over" the coal and their interests in it to the defendant. Soon thereafter negotiations between the two insurance companies and the Baxter Wrecking Company resulted in a proposal by the latter, in substance, to raise the boat and cargo of coal, "and de-

liver them alongside dock in New Haven, to be discharged for and in consideration of the sum of $1,000, to be apportioned between the boat and cargo according to the laws and usages of general average in such cases." This was agreed to. Under the agreement the boat was raised, and with all its cargo on board save the seventeen tons deck-load, taken to the wharf at New Haven. While there the plaintiff was notified by the Buffalo Insurance Company to go to New Haven and take charge of the boat. He notified the defendant of his claim for freight money and forbade the removal of the cargo until it was satisfied. The president of the company replied "he was not obliged to pay it, and would take the coal in spite of him." After this the coal was sold by defendant's directions, the wrecking company's charges satisfied, and the balance paid over to the defendant.

At the close of the trial the court was asked to direct a verdict for the plaintiff, and this being denied, the plaintiff requested the trial judge to submit to the jury the question whether or not the plaintiff neglected and declined to raise the cargo and complete the voyage, and also whether or not he "abandoned the cargo and the boat." This also was refused, and on motion by defendant the complaint was dismissed.

The General Term granted a new trial. We think properly. When, as in this case, payment of freight is a condition of delivery, the cargo becomes bound to the boat from the time it is received on board, until by some default on its part, or some event which puts an end to the voyage, it becomes impossible to fulfill the contract of affreightment (Abb. on Ship. 595), and if, in fact, it reaches the port of destination, so that delivery can be made, whether by the boat named or by another agency set in motion by the original carrier, or by one standing in his place, freight is earned, the lien continues and can be enforced. This follows from the rule, entirely well settled, that as between the owner and insurer a total loss of freight arises only where the ship and cargo are wholly lost, but if, although the ship itself be wrecked and utterly lost, the master can reship and forward the goods by reasonable endeavor and

reasonable cost, it is his duty to do so. (*Hubbell* v. *Gt. W. Insurance Co.*, 74 N. Y. 246.)

Here it is undisputed that all save the deck-load did reach the place of destination and was there disposed of by the assignees of the cargo, to whom its shippers undertook to transfer it. Apparently, then, the contract to carry was fulfilled, and the contract to deliver would have been but for the interference of the defendant. If by preventing delivery to the consignees, it has prevented the boat earning full freight, that circumstance cannot be to its advantage. The defendant assumes that the shippers were the owners and had the right of control. If so the abandonment of the cargo to its insurers can have no other effect than to put them in place of the insured, and make a delivery of the coal to them as valid for the purpose of earning freight as would have been a delivery to the owner, but neither could take it against the will of the shipmaster until payment of freight.

The learned counsel for the appellant does not claim that on the part of the owner of the ship there was a consummated abandonment. He says the plaintiff " tried to abandon. Under a clause in his policy he could not do this if insurers refused to accept abandonment; they did refuse." Again he says : " The refusal of his insurers to accept his abandonment was notice that the insurers would attempt to raise the boat, and they told him so from the first." The terms of the policy, already referred to, justify that claim. How, then, can it be said that there was an abandonment by him ? An abandonment of the cargo by the shippers or owners could not affect the boat. An actual abandonment of the boat to its insurer would have presented a different question. The freight pending would go with it as incident to the ownership, and if finally earned, would belong to the abandonee. It would have not only the title to the boat, but the possession and the advantages resulting from a completion of the voyage. But there was no abandonment to the insurers. The appellant's claim is that the plaintiff abandoned the voyage and treated it as put an end to, without the possibility of renewal and without the

intention of resuming it.  If that be so, then the contract was indeed dissolved.  On the other side is the contention that the question was not one of law, but at most one of fact for the jury to answer upon the evidence.  In that case the exception to the refusal of the trial judge to submit it to them was well taken. It is to be observed that the boat was in tow from New York, aided neither by sails of its own or steam, but carried along by the motive power of another vessel ; that, when by stress of weather it was cast loose and submerged, the place was marked by a buoy, to which before sinking it was attached. The object of this was that it might easily be found.  No other consequences in fact or law resulted from the sinking of the boat through the water to the bottom than would have attended its stranding.  In either case, although disabled from completing her voyage, the owner might still earn the whole freight by making the necessary repairs, or by sending the cargo to the place of its destination in another boat.  Here the boat, as the event clearly showed, was in position to be reached, repaired and sent on ; no removal, even of the coal, being necessary.  The voyage, therefore, was not lost, and under the stipulations of the policy the recovery of the boat must be considered as undertaken for the benefit and on account of its owner.  The insurance on the boat was for the voyage.  Neither boat nor cargo were in fact lost.  The boat was insured for $1,200.  The owner was paid $750, and of that about $300 went to the Baxter company.  The loss was a partial loss only, and so treated.  The boat at no time ceased to be the property of the plaintiff, and the expense of recovery was borne by him.

Upon the point now before us the evidence of the plaintiff and the president of the defendant is important.  The former testified that he at once, after the accident, informed the defendant of the attachment of the buoy and its purpose, and that the Buffalo Insurance Company were going to raise the boat.  He claimed his lien and forbade the removal of the cargo until freight was paid.  The testimony of the president hardly raises a conflict.  He remembers the interview with

the plaintiff soon after the loss, and while unable to remember the exact language used, says: "The effect of it, and the conclusion I came to was that he didn't mean to do any thing to get the vessel up; I think I said to him that being insured in the Buffalo company to the amount of $1,200, I supposed he had abandoned it, and we would have to make our own arrangements; I can't remember the exact language, but that is the conclusion we came to, and he gave me to understand that." He testified, however: "Hughes did not tell me in so many words that he had abandoned the boat and would have nothing to do with it; he gave me the impression he was going to have nothing more to do with it," and admits he was forbidden to take the cargo from the boat. But if there was contradiction, the construction of the testimony was for the jury. Unless voluntarily relinquished by the plaintiff, the legal possession which he had of the cargo continued after as it was before the accident, and I am unable to find any thing in the appellant's points which should relieve the defendant from answering for such damages as the plaintiff sustained by being deprived of it. The case should, therefore, have been given to the jury.

It does not follow that the recovery should include the full value of the cargo. It may extend no farther than the value of the plaintiff's special property, and this again be diminished by subjecting it to a share of the expense incurred for its recovery. Neither of these questions are before us. It is enough that we now concur with the court below in the decision that the plaintiff was improperly turned out of court.

The order appealed from should, therefore, be affirmed, and the plaintiff, in pursuance of the stipulation, have judgment absolute.

EARL, J. (dissenting). It is not important to determine upon this appeal whether the plaintiff was entitled to any freight for the transportation of the coal, nor, if any, how much. He was probably entitled to the whole of his freight less his share of contribution on account thereof with the vessel and cargo to

the salvage expenses; and for the purposes of this appeal we will assume he was.    His complaint was, however, properly dismissed at the trial.    The action is purely one for a wrongful conversion of the coal.    There is no allegation in the complaint of any contract or of any money due or earned for freight. The allegations are as follows: "That the defendant now is, and at the time mentioned in this complaint was, a domestic corporation.    That heretofore, to-wit, on the 5th day of November, 1881, this plaintiff, who then was and now is a common carrier, had in his possession and on board the boat "*Arizona*," of which he was owner, a large quantity of coal, which he had carried from the port of New York to the port of New Haven on freight.    The value of said coal was at least $1,000. On the day last aforesaid the defendant, by its agents and servants, entered upon said boat and by force and arms took therefrom the cargo aforesaid, in all to the damage of this plaintiff in the sum of $1,000, for which sum he prays for judgment against the defendant with interest and the costs and disbursements of this action."

It appears that the coal was shipped by the Delaware, Lackawanna and Western Railroad Company and insured for it by the defendant, and that the railroad company assigned, transferred and abandoned the coal and all its claim and interest therein to the defendant.    Hence the defendant had all the right to the coal of a general owner and cannot be treated as a wrongdoer in ordering it to be sold and removed from the boat unless at the time of such sale and removal the plaintiff had a lien thereon for his freight.

While there was not formal proof that the railroad company owned the coal, it may be inferred, in the absence of other proof, that it was owner, from the fact that it shipped the coal and insured it.    And further, it was assumed upon the trial that it was owner, and the point that the defendant had not shown sufficient title to the coal and did not stand in the place of the original owner was not taken at the trial.

It remains only to be determined, whether, at the time of the alleged conversion of the coal, the plaintiff had a lien thereon

for his freight which was destroyed by the acts of the defendant.

Carriers by land and water have a lien upon the goods transported for their freight, but the lien is lost when they voluntarily allow the goods to pass out of their possession, and in this way we think the plaintiff lost his lien.

Plaintiff's vessel with the coal was sunk in not less than forty feet of water on the 5th day of November, 1881, and he left it where it sank, never thereafter attempting to rescue it, or to complete its voyage, or manifesting the least intention to do so. The cargo was insured for the owner by the defendant, and the vessel was insured for the plaintiff by the Buffalo Insurance Company. Soon after the sinking of the vessel the plaintiff gave notice thereof to the Buffalo Insurance Company, the defendant, and the shipper of the coal, and he made to the Buffalo Insurance Company proofs of a total loss and offered to abandon the vessel. That company refused, under the terms of its policy, to accept an abandonment for a total loss, and announced its intention, in pursuance of the policy, to try to recover the vessel for the benefit of all concerned.

Thereafter, on the 17th day of November, the Buffalo Insurance Company and the defendant made a contract with the Baxter Wrecking Company to recover the vessel and cargo and deliver them at New Haven, the port of destination, for the sum of $1,000, to be apportioned between the vessel and cargo according to the laws and usages of general average in such cases. The wrecking company raised the vessel and cargo and by means of pontoons transported them to New Haven, and while they were there and the vessel was unable to float alone, being held up by chains passing under it and fastened to the pontoons, the defendant ordered the agent of the wrecking company to discharge and sell the coal, and this he did; and after deducting the share of the salvage expenses chargeable to the coal he paid over the balance of the proceeds to the defendant.

After the vessel and coal had reached New Haven, the plaintiff notified the defendant not to remove the cargo from

the vessel without paying his freight. But he did not resume actual possession of the vessel until after it was unloaded and removed to a dry dock at Jersey City. The claim of the plaintiff is that he remained during all this time in the constructive possession of the vessel and that the insurance companies and the wrecking company could be treated as his agents. They were not his agents; they did not assume to act as such, and they could not bind him by any thing they did. He was not bound by the agreement made with the wrecking company, nor bound to pay the compensation agreed upon. The three companies were all engaged as salvors, and their primary purpose was to secure benefits to themselves and not to the owner of the property. The fact that the plaintiff might derive some benefit from the salvage service did not make the salvors his agents. The primary purpose of all salvors is to benefit themselves by what they can make out of the salvage, and the fact that the owners of the vessel or cargo may also derive benefits never makes the salvors their agents.

Here the Buffalo Insurance Company owed the plaintiff no duty as to his freight which they had not insured, and it was under no obligation to aid him in earning that. Its sole duty was to indemnify him as to the vessel to the extent of its insurance. It was not bound to raise or save the cargo. For the purpose of raising the vessel it could have removed the coal therefrom and left it beneath the waters without violating any right of the plaintiff. So, too, neither the defendant nor the shipper owed the plaintiff any duty to raise either the coal or the vessel. In the contract with the wrecking company the defendant was seeking to save the coal and the Buffalo Insurance Company to save the vessel, and the one was really to pay for raising the vessel and the other for raising the coal. Under them and for them the wrecking company undertook to perform the salvage service, and it took possession of the vessel and cargo, and took both into the port of New Haven. It cannot be doubted that it then had possession of the vessel and coal and had a lien upon both for the salvage service. It was while it

thus had possession that the coal was discharged and sold by it under the direction of the defendant.

It cannot be said that the original taking of the vessel while it was beneath the water was unlawful because that was with the assent of the plaintiff. When informed that the insurance company intended to make efforts to recover the vessel he made no objection. By his silence, making no objection, and making no effort to recover the vessel or cargo, he must be held to have assented to all that was done until the boat reached New Haven, and at that point of time the boat and cargo were out of his possession, and the owner of the cargo had resumed control of the same, and the plaintiff had thus lost his lien.

Thereafter his remedy, if any, for his freight was an action *ex contractu* against the shipper or the defendant, and not an action in tort on account of any lien upon the cargo ; or he might have brought an action in equity against the shipper, the insurance companies and the salvors, and thus obtained an adjustment of the salvage expenses and an award for the balance due him for his freight.

If we hold, as we must, that the plaintiff is not in any form of action entitled to recover for his freight more than what was left, after deducting therefrom his share of the salvage expenses, then it is certainly quite extraordinary to hold that a recovery can be had in a pure action of tort against the defendant, also liable to contribute to salvage expenses, without the presence of all the parties liable to such contribution ; or in other words, that in an action of trover or trespass to recover the value of the whole cargo against the owner thereof, the salvage expenses can be adjusted between freight, cargo and vessel without the presence of the other parties interested therein.

I am, therefor, of opinion that the order of the General Term should be reversed and the judgment of the Trial Term affirmed, with costs.

RAPALLO, ANDREWS and MILLER, JJ., concur with DANFORTH, J., for affirmance, RUGER, Ch. J., and FINCH, JJ., concur with EARL, J., dissenting.

Order affirmed.

Judgment accordingly.