LINEA SUD–AMERICANA, Inc., v. 7,295.-40 TONS OF LINSEED et al.

District Court, S. D. New York.
May 10, 1939.

Bigham, Englar, Jones & Houston, of New York City (Roscoe H. Hupper and F. Herbert Prem, both of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Ira A. Campbell and Clement C. Rinehart, both of New York City, of counsel), for claimant-respondent.

LEIBELL, District Judge.

Libelant, as the operator of the Spanish motor vessel "Motomar", brings this suit in admiralty for the freight on respondent's cargo of linseed, under a bill of lading issued for the transportation of the cargo from Rosario and Buenos Aires to New York in December, 1936. The amount claimed represents the full freight of $36,245.50 that would have been payable if libelant had delivered the cargo in New York. The vessel was diverted from its course to the port of Vera Cruz by order of the Spanish (Loyalist) Government and the cargo was then transferred and reshipped under circumstances hereinafter set forth.

Respondent is a Delaware corporation with a place of business in New York City. Libelant is a Delaware corporation with a place of business in New York City. Messrs. Marcelino Garcia and Manuel Diaz have been residents of New York for many years, but at the time the alleged cause of action arose they were of Spanish nationality. Libelant was the charterer and operator of the motor vessel "Motomar" which was owned by the Compania

Espanola de Navegacion Maritima S. A., a Spanish corporation. The Compania Espanola de Navegacion Maritima S. A. had, as its sole stockholders, Marcelino Garcia and Manuel Diaz, the same persons who are libelant's stockholders, principal officers and agents and who controlled the firm of Garcia & Diaz. The firm of Garcia & Diaz of New York were the agents for both the libelant and the Compania Espanola de Navegacion Maritima S. A. The acts and events which gave rise to this litigation were an outgrowth of the recent civil war in Spain. Messrs. Garcia and Diaz were Franco or Nationalist sympathizers.

On or about December 3, 1936, libelant, through Garcia & Diaz Lda., its representatives at Buenos Aires, Argentina, entered into a contract of carriage with the Cia De Comercio Ltda. van Waveren, which was acting as respondent's agent, whereby libelant agreed to transport on the "Motomar" 13,560 bags of linseed, said to weigh 819,300 kilos, and a quantity of linseed in bulk, said to weigh 6,593,300 kilos, from the ports of Rosario and Buenos Aires, Argentina, to the port of New York, there to be delivered to the shipper's order, according to the terms of the bill of lading. The freight was payable on delivery of the cargo in New York and amounted to $36,245.50.

The linseed was loaded and the vessel started on December 3rd, 1936 on its voyage to New York. On December 10th, 1936, the Spanish (Loyalist) Government issued a decree expropriating the "Motomar" to the public service. This decree was promulgated in the Gaceta de Madrid, an official Spanish publication, on December 12th. While enroute, on December 15th, 1936, the Master received a wireless communication from the Spanish Ambassador at Washington, transmitted to the master through the Spanish Ambassador at Buenos Aires, notifying him that the "Motomar" had been confiscated by the Spanish (Loyalist) Government and directing him to proceed to the port of Vera Cruz, Mexico. The entry of the master in the ship's log reads as follows (translation):

"December 15, 1936. At nineteen hours I received a radiogram from the Spanish Ambassador at Buenos Aires, retransmitting to me an order from the Ambassador at Washington to the effect that this ship of my command had been confiscated by the Government of the Spanish Republic and ordering me in the name of same to proceed direct to the port of Veracruz, (Mexico).

"Calling the officers to a conference in which I made known to them the orders received it was resolved to obey all of them without reservation. Following this the rest of the crew was brought together making known to them also the radiogram received, the crew expressing unanimously their conformity with the orders received from the Government of the Republic. In consequence we followed immediately a direct course for the port of Veracruz."

On December 17th Garcia & Diaz, having heard rumors that the ship had been confiscated, sent a radiogram to the master requesting the date of his arrival in New York. They received no reply. On December 23rd they sent another message requesting the same information. On December 24th Garcia & Diaz received a message from the master of the "Motomar" to the effect that the steamer was sailing under direct and absolute orders from the Spanish Government. Garcia & Diaz sent a radiogram on December 26th directing the master not to follow the orders of the Spanish (Loyalist) Government and again requesting the date of his expected arrival in New York. On the same day they received a reply from the master stating that his decision was based on loyalty and patriotism and that he welcomed whatever consequences and responsibilities might fall upon him because of his irrevocable attitude. On December 28th Garcia & Diaz again wirelessed the master to proceed to New York. There was no news from the ship until she arrived at Vera Cruz on December 30th.

Meanwhile Garcia & Diaz cabled the office of the Compania Espanola de Navegacion Maritima S. A. in Barcelona on December 19th asking whether or not the "Motomar" had been confiscated. On December 23rd they received a reply that the vessel had been confiscated on December 10th and that thereafter, and prior to December 18th, the company also had been confiscated. Immediately Garcia & Diaz, through their attorneys and their insurance brokers, tendered abandonment of the vessel to the underwriters in England on behalf of the owner, Compania Espanola de Navegacion Maritima S. A. The tender was made only under the war risk policies and not under the marine insur-

ance policies on the hull. The tender of abandonment was made on December 24th and it was refused the same day, but the underwriters agreed to the usual writ clause, putting the assured in the same position as if writs had been issued. Libelant, as charterer of the "Motomar", did not at that time make any tender of abandonment to the insurer of the freight; and did not do so until February, 1937, when a large part of the cargo had arrived in New York. However, since the same interests controlled both the owner and the charterer, that distinction is unimportant to the decision of this case.

On December 23rd Mr. Garcia telephoned Mr. Daniels, vice-president of the respondent, in Minneapolis and informed him that the "Motomar" had been confiscated and that Garcia & Diaz had received a report from their agent in Argentina that the master had been instructed by the Spanish Ambassador in Washington to proceed to Vera Cruz. Mr. Garcia said nothing, however, about the tender of abandonment by the owner of the ship under the war risk policies.

Mr. Daniels immediately got in touch with the State Department in Washington and lodged a protest against the diversion of the cargo. He then telegraphed Garcia & Diaz on December 23rd requesting information with respect to storage facilities at Vera Cruz and inquired whether Garcia & Diaz had any means of transporting the cargo from Vera Cruz to New York. On December 24th Mr. Garcia again telephoned Mr. Daniels telling him that there were no grain elevators or similar facilities at Vera Cruz. Libelant had no facilities at Vera Cruz for transporting the cargo to New York. On the same day Mr. Daniels telegraphed the office of the Secretary of State requesting them to ascertain definitely where the vessel was proceeding and asking that the necessary steps be taken to require proper delivery of the cargo. Mr. Daniels referred Mr. Garcia to respondent's attorneys in New York and Mr. Garcia conferred with them and expressed a desire to give fullest cooperation. Mr. Garcia wrote Mr. Daniels of the respondent company on December 28, 1936, advising him of the conference and of a wireless Garcia & Diaz had sent that day to the master of the "Motomar" protesting against his conduct and reminding him of his duty to deliver the cargo in New York.

On December 29th libelant sent a telegram to the Secretary of State requesting that its interests in the "Motomar" be protected as an American citizen. However, in view of the fact that the sole stockholders of libelant were Spanish citizens, the State Department was not in a position to make any representations to the Spanish Government in libelant's behalf.

On December 30th respondent received the following telegram from the Secretary of State: "Spanish Under Secretary of Marine states that Motomar was requisitioned two weeks ago and ordered to Veracruz, Mexico. He states that his government guarantees safety of cargo. We are requesting information as to arrangement for delivery". On the same day the State Department telegraphed libelant that the "Motomar" had arrived in Vera Cruz and that they were taking up with the Spanish Government at Valencia the possibility of delivering the cargo at New Orleans. Libelant caused several letters to be delivered to the master of the "Motomar" at Vera Cruz protesting against his deviating from the voyage and demanding that he proceed to New York with the cargo.

Libelant's attorneys also sought an opinion as to the rights and remedies of libelant in respect to the "Motomar" under Mexican law and on January 6, 1937, libelant's representative at Vera Cruz obtained an opinion from D. Rafael Dominguez, a Mexican lawyer. The opinion was transmitted to New York in a letter dated January 11, 1937, and its conclusions were sent libelant in a night letter of January 10th reading as follows: "Motomar lawyer confirms that under Mexican laws nothing could be done to either force the ship to continue its journey to Edgewater or to prevent its sailing from here under orders of the Spanish Government."

On December 30th, libelant's attorneys prepared a letter to be sent by libelant to the respondent at Minneapolis, copies being mailed to respondent's New York and Edgewater, New Jersey, offices also, claiming a lien on the cargo for freight in the sum of $36,245.50 pursuant to the bill of lading. Respondent did not receive the letter until January 4, 1937. The letter also stated that delivery of the cargo at any port other than New York was without libelant's authority and protested against the payment of freight to any one other than libelant.

On December 31st a conference was held at the office of Mr. Jones, legal representative of Garcia & Diaz. There were present at that time Mr. Siddal, as legal representative of respondent, Mr. Jones, Mr. Garcia, Mr. Diaz and Mr. Alvarez, the only other director of libelant. There is some dispute as to what occurred at that conference. Messrs. Jones, Garcia, Diaz and Alvarez testified that Mr. Siddal was informed of the situation and told that because of the Franconist sympathies of Garcia and Diaz they could do nothing with the Spanish Loyalist Government. Further, that if they went out and tried to charter vessels, the rate would be raised as the other brokers knew they were in distress and it would be very expensive. They suggested that the respondent charter a vessel and that both parties should cooperate with one another to see that the cargo got to New York. They informed Mr. Siddal of the contents of the aforementioned letter of December 30th which they had sent to the respondent. Mr. Siddal's recollection of what occurred at the conference is somewhat different. He stated that nothing was said regarding the letter of December 30th; that Garcia and Diaz indicated that they would not endeavor to transship the cargo because the expense would be greater than the total freight.

▆ I find that Garcia and Diaz knew that they could not themselves do anything effective because of their Spanish citizenship and Nationalist (Franco) sympathies and the necessity of dealing with the Spanish Loyalist Government; that they then proposed that respondent cooperate and take over the burden of arranging for the transshipment of the cargo to New York; that the respondent make claim on the Spanish Government for respondent's damages including the cost of transshipment and transportation from Vera Cruz; that libelant then receive its freight charges from respondent, and that respondent keep whatever it received from the Spanish Government over and above the original rate.

· Mr. Siddal did not have authority to make such an arrangement and, moreover, he felt that respondent should be entitled to reimbursement of its full losses, including consequential damages, if any, before libelant should be paid any freight and so stated, but he said he would take the matter up with his associates. No definite agreement was reached one way or the other, with relation to reimbursement. It should be noted that under the provisions of the bill of lading libelant was not liable to respondent for any damages that might be sustained by respondent by reason of the conduct of the master acting under the decretal orders of the Spanish Government. This is not disputed and was known to the parties at the time of the conference of December 31st. The extent of libelant's offer of cooperation was that respondent assist libelant in collecting its freight out of any claim that might be asserted by respondent against the Spanish Loyalist Government. Libelant did not indicate any purpose on its part to furnish transportation for the cargo from Vera Cruz to New York.

From that time on the parties apparently went their separate ways, each one endeavoring to have the State Department make strong representations to the Spanish Loyalist Government to bring on the cargo to the port of New York. Libelant also endeavored to seek some remedy under the Mexican law to obtain possession of the "Motomar" or compel the delivery of her cargo to New York. The Mexican Government was sympathetic to the Loyalist cause and the ship was protected by Mexican soldiers. Two of the officers of the "Motomar" who had refused to join with the master in obeying the orders of the Spanish Ambassador on December 15, 1936, to seize the ship, were confined in Mexican military barracks for a week.

Respondent communicated with the International Freighting Corporation on December 30th to inquire about chartering vessels to transship the cargo. Respondent obtained certain options on three vessels to carry the cargo from Vera Cruz to respondent's Edgewater, New Jersey, plant and this fact was communicated to the Spanish Consul at Vera Cruz for the purpose of having the Spanish Government approve and assume the cost of the charter.

On January 5, 1937, the Acting Secretary of State of the United States sent the respondent a telegram, in which was set forth a message dated January 3, 1937, sent by the Spanish Consul at Vera Cruz to the Spanish Charge d'Affairs in Mexico and by him transmitted to the United States Embassy at Mexico City. The message of the Spanish Consul was fully

confirmed by the Spanish Charge d'Affairs. The Spanish Consul's message, among other things, states: "It is advisable that either the Department of State of Washington or the Daniels firm take charge of the sending to this port at the earliest date possible of the vessel or vessels which are to assume charge of the transshipment of the cargo. * * * The linseed has not been unloaded and will not be until the arrival of the vessels which are to load it. * * * The proposition of the International Freighting Corpn. freight agents in New York of the Daniels firm of $2.85 per long ton is accepted. * * * If the Daniels firm cannot secure vessels which will arrive in Vera Cruz before the 12th or 13th the offer is accepted so that they will arrive in Vera Cruz on the date indicated."

The Acting Secretary of State of the United States in forwarding this message to respondent added: "The department cannot of course undertake to arrange for the sending of a vessel or vessels to Vera Cruz to transship your cargo."

The day after the receipt of that message respondent signed a trip charter party (from Vera Cruz, Mexico, to Edgewater, New Jersey) with the Steamship Owners Operating Company, Inc., for the three steamships, the "Nidareid", the "Gunda" and the "Siredal", to proceed to Vera Cruz and receive the entire cargo of linseed then aboard the Spanish motorship "Motomar", about 2,500 tons to be loaded into the S. S. Nidareid, about 2,800 to 3,000 tons into the S. S. Gunda, and the balance of the available tonnage into the S. S. Siredal. International Freighting Corporation arranged the charter under the option.

These arrangements were made pursuant to the agreement with the Spanish Consulate at Vera Cruz, and at its request. On January 7th, and as part of the arrangement the Spanish Consul at Vera Cruz deposited a check for $25,000 with the National City Bank at Mexico City, to open an account at the National City Bank, New York City, for the purpose of paying the stevedoring charges at Vera Cruz in transshipping the cargo, the freight on the three abovementioned vessels, and also the unloading charges at Edgewater, New Jersey. This deposit was in a joint account, to be drawn on by Jose Arguelles, Spanish Consul at Vera Cruz, and J. H. Drake, acting as agent for the respondent

at Vera Cruz, subject to countersignature by National City Bank at Mexico City.

On January 8th respondent replied to libelant's letter of December 30th, received January 4, 1937, and denied that respondent was liable to libelant for any freight and stated that libelant had advised respondent's attorneys that it could not and would not make any arrangements for transporting the cargo and that respondent had chartered vessels to transport the cargo to its destination. Respondent also stated that it would hold libelant responsible for all loss, damage and expense consequent upon libelant's breach of contract for the transportation of the said cargo to New York. No mention was made, however, of respondent's aforesaid arrangements with the Spanish Government.

The three vessels went to Vera Cruz and took the cargo from the "Motomar". The "Nidareid" commenced receiving cargo January 15, 1937, finished loading and sailed on January 21st, and arrived at the port of New York on February 2nd. The "Gunda" commenced receiving cargo January 28, 1937, and finished loading and sailed on February 4th. At respondent's direction this vessel went to New Orleans instead of New York and arrived there on February 10th. The "Siredal" took off the remainder of the cargo, beginning February 6, 1937, sailed February 16th and arrived in New York on February 27th.

The payments due under the charter party for these three ships were first made by the New York branch office of the respondent. Respondent, in turn, was reimbursed from the joint account in the National City Bank. The direct expenses arising from the transshipment amounted to $26,173.55 and respondent was completely reimbursed in this amount.

Incidental expenses arising from the diversion and transshipment were alleged to have amounted to $14,254.67. These were alleged to be due to additional insurance, some dockage and demurrage, overtime, telephone, telegram and traveling expenses, legal expenses, etc. Mill operating losses in the sum of $85,297.97 were alleged to have been caused by the delay due to the diversion and transshipment and there were other small items as well. A claim for the incidental expenses, mill operating losses and other items, totaling in all $102,732.60, was made by respondent to the Spanish Ambassador and was settled for the sum of $40,000 which was paid

respondent on October 6th, 1937. Included in the claims of respondent thus settled were the incidental expenses of $14,254.67 above mentioned.

On February 10th, 1937, part of the cargo having reached New York, libelant filed its libel for freight in the sum of $36,245.50, praying that process issue against the linseed and citing respondent personally. A stipulation for value and for costs was entered into between the parties and issuance of process waived in consideration of the filing of claim to the linseed by Archer-Daniels-Midland Co., as claimant, and its filing a notice of appearance as respondent. Respondent served its answer June 17, 1937, and counterclaimed for $105,000 for its damages and expenses arising from the diversion and transshipment, but the counterclaim was withdrawn June 2, 1938.

Neither party to this litigation made a full disclosure of its purposes and acts to the other, when the expropriation of the "Motomar" by the Spanish Government presented the problem of transshipping and transporting the cargo to its port of destination and the question of libelant's right to any freight under the original bill of lading. Both sought a financial advantage in respect to the freight. The owner of the "Motomar" gave notice of abandonment of the "Motomar" to its London underwriters of the war risk policy on December 23rd, 1936, claiming for a total loss and instructed its legal representatives in London to follow the same procedure as in the case of the "Navemar", issuing writs if the indemnitors declined tender of abandonment. Libelant did not inform the respondent of this fact.

The "Motomar" underwriters declined abandonment but agreed to the writ clause and inquired if the owners proposed instructing the master to bring the vessel to New York. This was done. The notice of abandonment was not withdrawn. The owner's war risk policy included "risks of confiscation by representatives of any government and/or insurgents." The owner's insurance on the hull and machinery included "privilege to insure voyage freights". Libelant, as charterer from the owner, separately insured its freight. The owner of the "Motomar", a Spanish corporation, was itself confiscated by the Spanish Government in December 1936, on or shortly prior to the 18th.

The libelant, while offering to cooperate with respondent, did not itself negotiate for any vessels to take over the cargo at Vera Cruz and transport it to New York, although libelant was fully informed of the non-existence in Vera Cruz of elevators or warehouses in which the linseed cargo could be stored pending reshipment and must have realized that prompt arrangements for transshipment were necessary. Libelant was not in any position to negotiate with the Spanish Government because libelant's stockholders were Franco sympathizers. Nor could libelant, although a Delaware corporation, enlist the aid of the State Department of the United States, because the stockholders of libelant were Spanish subjects. After respondent had chartered three vessels to bring on the cargo, libelant never offered to assume financial responsibility for the charter hire. Libelant on April 9, 1937, filed a claim with its insurers for the loss of freight of $36,245.50.

The Spanish Government had given assurances to the State Department that the cargo would be protected on December 30th, 1936. Respondent knew this and in the ensuing week had comparatively little difficulty, through the aid of the State Department, in getting the Spanish Government to agree to transship the cargo and to pay for its carriage to the original port of destination. Respondent's financial arrangements with the Spanish Government were concealed from libelant. In respondent's letter to libelant of January 8, 1937, no mention is made of those arrangements. Respondent asserted a counterclaim in this proceeding for damages, which was not withdrawn until June 1938. At the opening of the trial there was no disclosure made that the stevedoring charges at Vera Cruz and the freight charges from Vera Cruz to New York and some incidental items relating to the transshipment, $26,173.55 in all, had been paid by the Spanish Government in the early part of 1937, or that an additional $40,000 had been paid by the Spanish Government October 6, 1937, in settlement of respondent's claim for damages and for certain additional transshipment expenses. It was not until the last day of the trial that these facts were brought out through the cross-examination of one of respondent's officers and the introduction in evidence of documents which revealed respondent's negotiations with the

Spanish Government directly and through the State Department, the assumption and payment by the Spanish Government through respondent of the freight, stevedoring charges, taxes and some demurrage in the transshipment and transportation of the cargo to ports of discharge designated by respondent, and the later settlement of respondent's further claim as above indicated.

It is contended by libelant that in paying the transshipping expenses at Vera Cruz and the freight for transporting the cargo to New York and New Orleans the Spanish (Loyalist) Government should be held in effect to have acted as libelant's agent, so that libelant has completed the carriage of the cargo to the port designated in its bill of lading, except for the diversion of part of the cargo to New Orleans at the direction of respondent, and that therefore libelant is entitled to the full freight of $36,245.50. Libelant cites the case of Hughes v. Sun Mutual Ins. Co., 100 N.Y. 58, 2 N.E. 901, 3 N.E. 71. In disposing of this contention I will first consider the effect of the Spanish Government's decree and the action of the master and the crew thereunder.

The decree of the Spanish Government, dated December 10th, 1936, together with the action of the master and the crew on December 15th, taking possession and control of the ship in behalf of the Spanish Government pursuant to said decree, transferred the title and right to possession of the "Motomar" to the Spanish Government. Compania Espanola De Navegacion Maritima, S. A. v. Crespo (The Navemar), 2 Cir., 102 F.2d 444; see, also, the same case on a prior appeal, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667.

The first, fourth, and sixth paragraphs of the decree in the case of the "Motomar" read as follows (translation):

"Article 1st. The Spanish Government confiscates the ship 'Motomar' of the Compania Espanola de Navegacion Maritima, S. A., which remains subjugated as a ship of the State, to the national public service. Its administration shall be directed by the Ministry of Communications and Merchant Marine, by means of the Direction General of the Merchant Marine.

\*   \*   \*   \*   \*

"Article 4th. The Spanish Government subrogates itself in whatever lawful credits and obligations refer to the confiscated vessel. The decision on pending claims or on those that may be established as a consequence of the maritime operations or needs of said vessel corresponds (Sic) exclusively to the Spanish Tribunals.

\*   \*   \*   \*   \*

"Article 6th. Are declared null and void and without any value or effect the simulated maritime debts and the alienations and enrolments made or attempted in foreign countries or in benefit of foreign subjects or entities by the Company owning the confiscated vessel, or in its name or for its account, as well as the assignments and transfers of its credits, currency or securities in favour of foreign persons or of persons residing in foreign countries."

The action of the Spanish Government, in promptly agreeing to guarantee the safety of the "Motomar's" cargo and to pay for its transportation to New York, was to be expected in view of the provision of Article 4th of the decree of expropriation dated December 10, 1936. The Spanish Government subrogated itself (se subroga) to the obligations of the ship and the "Motomar" was obligated under the bill of lading for the safe carriage of the cargo to the port of destination, New York. What the Spanish Government later did in bringing on the cargo to New York is only what it obligated itself to do in the decree of expropriation. But it is evident both from the decree and from other facts that the Spanish Government did not intend to act for libelant or that libelant should thereby become entitled to the freight under its original contract with respondent. The Spanish Government under Article 4th of its decree took over the credits or earnings of the ship as well as its obligations and under Article 6th struck at the charter arrangement between the Spanish corporation, as owner, and the libelant, an American corporation with the same stockholders.

The vessels that transported the "Motomar's" cargo were obtained by respondent "in accordance with request of Spanish Consul Vera Cruz" according to a telegram respondent sent the Acting Secretary of State of the United States on January 5, 1937. The offer of the three vessels was submitted to the Spanish Consul at Vera Cruz by respondent on January 4th. That offer was at a slightly higher rate ($2.90 per long ton) than the rate ($2.85 per long ton) respondent had orig-

inally submitted. Respondent requested the Acting Secretary to have the American Ambassador at Mexico City "secure agreement of Spanish Ambassador to this arrangement."

■ In my opinion respondent acted as the agent of the Spanish Government in chartering these ships to receive the "Motomar's" cargo and bring it on to its original port of destination. (Edgewater, New Jersey, is in the harbor of New York, opposite the upper end of Manhattan Island. Under the bill of lading for the original shipment on the "Motomar" the consignees had the option to discharge the cargo at their own wharf at Edgewater, New Jersey.) Respondent in arranging to send the steamers to Vera Cruz for the "Motomar's" cargo was doing what the Spanish Consul at Vera Cruz, in his telegram of January 3, 1937, referred to above, suggested that the State Department of the United States should do, the Spanish Government agreeing to pay the expenses of transshipment and the freight for transporting the cargo to New York. The arrangement provided that "the Spanish Government, would undertake to transship the 'Motomar's' cargo of flaxseed". Further respondent did not obligate itself on the charter for the three vessels until it had assurances that the Spanish Government was depositing $25,000 in a joint account, to be drawn upon by respondent's representative and the Spanish Consul jointly, and to be used in payment of expenses of transshipment and transportation.

In its letter of December 30, 1936, libelant notified respondent as follows: "We beg to advise you that we claim a lien on the said Linseed for freight as provided in the Clause just quoted from the Bill of Lading. As Linea Sud Americana Inc. is a corporation created and existing under the laws of the State of Delaware, we are in no way subject to any orders of the Spanish Government. For this reason we protest against your paying any freight to the representatives of the Spanish Government or to anyone other than ourselves as Charterers."

The letter of respondent to libelant dated January 8, 1937, stated in part: "On December 31, and previously you advised our attorneys and us that you would not and could not make any arrangements for transporting this cargo on to destination. Upon receipt of this advice we immediately made arrangements to charter vessels to proceed to Vera Cruz and lift the cargo and transport it to destination."

Any one reading that paragraph would conclude that respondent was paying the charter hire for the vessels that were to proceed to Vera Cruz, take over the cargo and transport it to destination. The concluding paragraph indicated that respondent intended to hold libelant responsible for this expense. Not a word was said about the Spanish Government paying for the transshipment or having deposited $25,000 for that purpose. But respondent was careful "to deny that we were responsible to you (libelant) for any freight". Respondent has not paid either libelant, or any other person, or the Spanish Government, any freight for the transportation of the cargo from Argentina to New York, or to any intermediate port, or from any intermediate port.

■ This, at first glance, seems an inequitable result, especially since the Spanish (Loyalist) Government, whose acts in expropriating the "Motomar" and diverting the ship to Vera Cruz made it impossible for libelant to perform its contract of affreightment, has in effect itself delivered respondent's cargo to its original port of destination or as otherwise directed by respondent. But libelant's stockholders and officers have contributed to this result through their own conduct. They are also the owners of the "Motomar", through their ownership of the stock of Compania Espanola de Navegacion Maritima S. A. The Spanish corporation made a tender of abandonment of the "Motomar" to the underwriters on the war risk policy on December 23rd. This, together with the failure of libelants, its officers and agents, to take any steps to procure other vessels to bring on the "Motomar's" cargo to its original port of destination, establishes an abandonment of libelant's contract of carriage with respondent and a loss of any right on libelant's part to claim freight from respondent under that contract.

■ Libelant complains that the action of respondent in getting options on vessels to carry on the "Motomar's" cargo and in concluding arrangements with the Spanish (Loyalist) government was so precipitate as to prevent libelant from making its own arrangements. Respondent had a $400,000 cargo at stake, on a ship that had been legally seized by a foreign government, in a port, Vera Cruz, where there were no warehouse facilities. The bill

of lading issued to respondent for the transportation of the cargo on the "Motomar" from Buenos Aires to New York contained an exception that barred respondent from making any claim against libelant for damage to or loss of the cargo, due to the acts of the Spanish (Loyalist) Government. Libelant had done nothing effective to meet the situation created by the seizure of the "Motomar" and was unwilling to make any commitment to bring on the cargo, when respondent asked libelant's intentions in that regard. Further, it was manifest to the parties that there would be scant margin of profit for libelant, on its original contract, if it undertook to pay the cost of transshipment at Vera Cruz and the freight on to New York. Besides, libelant and its officers were not likely to receive much assistance from the Spanish (Loyalist) Government and that would not serve to facilitate the operation or keep down its expense. Under the circumstance, it cannot reasonably be argued that any of respondent's acts prevented libelant from fulfilling the terms of its contract of affeightment.

The arrangement by which the Spanish corporation chartered the "Motomar" to the libelant, a Delaware corporation, each with the same stockholders, was evidently intended to block any action by the Spanish (Loyalist) Government in seizing the ship. Yet this situation, too, was met by paragraph sixth of the Spanish Government's decree, above quoted. The charter by the Spanish corporation to libelant was what the Spanish (Loyalist) Government characterized in said paragraph as "the simulated maritime debts and the alienations and enrolments made or attempted in foreign countries" and declared the same to be null and void. Further the Spanish corporation, owner of the "Motomar", was itself confiscated by the Spanish (Loyalist) Government. The result of all this was that libelant could not complete the performance of its contract of affreightment with respondent through the "Motomar" and, as I have indicated, made no effort to get any other ships to carry on the cargo. On the facts in this case respondent was justified in concluding that libelant did not intend to do anything to bring on the cargo in other vessels and respondent was excused "from further performance on its side". The Eliza Lines, 199 U.S. 119, 26 S.Ct. 8, 50 L.Ed. 115, 4 Ann.Cas. 406.

The wording of the decree manifested the purpose of the Spanish (Loyalist) Government to deprive libelant, and in particular its Spanish stockholders, Mr. Garcia and Mr. Diaz, of any interest whatsoever in the "Motomar" or its freight. In arranging and paying for the transshipment and transportation of the "Motomar's" cargo of linseed the Spanish (Loyalist) Government desired to avoid any difficulties with the Government of the United States, with which it maintained friendly relations, that might result from damage to the cargo owned by respondent, an American citizen. The Spanish Government was acting for itself and its own best interests. It was not intending to enable libelant to complete its contract of affreightment and become entitled to the freight under the original contract of carriage with respondent. In its final analysis the result must be charged also to the contract libelant made with the respondent—"freight payable at destination". If libelant wished to be sure of its freight, it should have had a proper prepaid freight clause in the bill of lading, at the same time retaining in the bill of lading the first paragraph of its exceptions, relating to restraint of governments. Standard Varnish Works v. Steamship Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321.

The rights of the parties in this litigation are, by the terms of the bill of lading, to be determined under the law of the United States. If a ship is overtaken by a disaster, or the restraint of princes or governments makes it impossible for the ship to continue its voyage to the port of destination, the shipowner is not entitled to "freight payable on delivery" at said port unless he brings the cargo forward in other vessels, or is prevented from doing so by the owner of the cargo. Ellis v. Atlantic Mutual Ins. Co. (The Tornado), 108 U.S. 342, 2 S.Ct. 746, 27 L.Ed. 747.

In The Tornado case there appears the oft quoted statement of the law as set forth by Lord Ellenborough in Hunter v. Prinsep, 10 East 378, 394, as follows: "The shipowners undertake that they will carry the goods to the place of destination, unless prevented by the dangers of the seas, or other unavoidable casualties; and the freighter undertakes that if the goods be delivered at the place of their destination he will pay the stipulated freight; but it

was only in that event, viz., of their delivery at the place of destination, that he, the freighter, engages to pay anything. If the ship be disabled from completing her voyage, the shipowner may still entitle himself to the whole freight, by forwarding the goods by some other means to the place of destination; but he has no right to any freight if they be not so forwarded; unless the forwarding them be dispensed with, or unless there be some new bargain upon this subject. If the shipowner will not forward them, the freighter is entitled to them without paying anything. One party, therefore, if he forward them, or be prevented or discharged from so doing, is entitled to his whole freight; and the other, if there be a refusal to forward them, is entitled to have them without paying any freight at all. The general property in the goods is in the freighter; the shipowner has no right to withhold the possession from him, unless he has either earned his freight, or is going on to earn it. If no freight be earned and he decline proceeding to earn any, the freighter has a right to the possession."

■ Respondent did not agree with libelant to accept delivery at any other place than the original port of destination. Proof of acceptance of the cargo by respondent from libelant at Vera Cruz would have to be clear and satisfactory to operate as a discharge of the vessel. Barrell v. The Mohawk, 8 Wall. 153, 19 L.Ed. 406.

■ The exception of the bill of lading releasing libelant from any claim for damages to the cargo, that was due to "The act of God, the King's enemies, pirates, robbers, thieves, vermin, barratry or master and mariners in navigating the vessel, restraints of princes and rulers or people, the result of strikes and/or the action of mobs" did not affect the conditions under which libelant would be entitled to the freight. Freight was "payable at destination", New York, on delivery of the cargo. Carver on Carriage of Goods by Sea states the rule as follows: "547. If the shipowner has been prevented from carrying the goods to their destination, although by causes which he could not control, he cannot claim any part of the freight; for he has not earned it. That is so whether the preventing causes are physical, or arise from an interference of enemies, or of Government, whether British or foreign. Nor does it affect the matter that the causes were perils excepted by the contract."

■ There is no issue in this case as to any right to freight "pro rata itineris", because the cargo owners did not voluntarly agree to receive the cargo at a place short of its destination, New York. Caze v. Baltimore Ins. Co., 7 Cranch 358, 3 L.Ed. 370; Barrell v. The Mohawk, 8 Wall 153, 19 L.Ed. 406. Respondent was obliged to arrange for transshipment at Vera Cruz in order to get the cargo on to New York. Respondent's act was not voluntary. It was the result of the circumstances and conditions with which it was then confronted, including libelant's inaction and the shipowner's abandonment of the vessel to the underwriters.

■ The underwriter's refusal to accept abandonment did not affect the shipowner's rights under a notice of abandonment properly given. Sec. 62(4) of British Marine Insurance Act of 1906. The underwriter's agreement on receipt of the notice to waive the issuance of writs put the shipowner in the same position as if suit had been immediately instituted. The abandonment "is considered as a continuing abandonment, notwithstanding a refusal to accept it, unless it is withdrawn by the party offering it." The Sarah Ann, 21 Fed.Cas. No. 12,342.

The case of Hughes v. Sun Mutual Ins. Co., 100 N.Y. 58, 2 N.E. 901, 902, 3 N.E. 71, decided by a closely divided court and never cited thereafter so far as I have been able to ascertain, is clearly distinguishable from the case at bar. In the Hughes case a barge with a cargo of coal aboard was cast adrift in a storm and the captain, having attached a buoy to her, left her and she sank. The place of her sinking having been thus marked with a buoy she was readily located. The cargo owners abandoned to cargo underwriters who paid the loss. The policy of the barge owner contained a provision that the owner should not have the right to abandon except for actual total loss and that anything done by either the insured or the insurers to recover the property should "be considered as done for the benefit of all concerned". The hull and cargo owner underwriters jointly arranged for salvage. The barge was raised and brought to her port of destination and the barge owner paid the expense of recovery and resumed possession of the boat and cargo. Although the barge owner notified the cargo underwriters of its claim for the freight, the cargo underwriters removed and sold

the cargo. A suit for conversion followed. The trial court refused to submit to the jury the question of whether plaintiff had "abandoned the cargo and the boat". This was held error and a new trial was ordered.

But in the Hughes case "under the stipulations of the policy the recovery of the boat must be considered as undertaken for the benefit and on account of its owner". The appellate court held in effect that freight is earned when the delivery is finally made "by the boat named or by another agency set in motion by the original carrier or by one standing in his place", such as his underwriters. In holding that the question of abandonment presented an issue of fact for the jury in the Hughes case the appellate court made this statement in respect to the effect of abandonment—"An actual abandonment of the boat to its insurer would have presented a different question. The freight pending would go with it as incident to the ownership, and if finally earned would belong to the abandonee. It would have not only the title to the boat, but the possession, and the advantages resulting from a completion of a voyage."

I am of the opinion that the libel in the case at bar should be dismissed on the merits.

The foregoing opinion will stand as the Court's findings of fact and conclusions of law, unless either of the parties requests that it be supplemented by additional findings and conclusions, and serves and files a copy of such proposed additional findings and conclusions within five days of the filing of this opinion with the Clerk of this Court.

A decree will be entered in accordance with this opinion. Submit proposed decree on the usual notice.