**LINEA SUD–AMERICANA, Inc., v. 7,295.40 TONS OF LINSEED.**

No. 162.

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1940.

Bigham, Englar, Jones & Houston, of New York City (Roscoe H. Hupper, F. Herbert Prem, and J. Franklin Fort, all of New York City, of counsel), for appellant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Ira Campbell, Clement C. Rinehart, and William P. Lage, all of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

This is a suit for freight earned by a ship; it is based upon the performance of the contract of carriage, and the defense is that the carrier did not perform. The facts are as follows. The Compania Española de Navegacion Maritima, S. A., was a Spanish corporation, the owner of the ship, "Motomar," which it had chartered to the libellant, an American corporation. The libellant had engaged by bill of lading, "freight payable at destination", to carry a cargo of linseed for the respondent by the "Motomar" from Buenos Aires to New York. While on the high seas on December 15, 1936, the "Motomar's" master received a radiogram from the Spanish ambassador at Buenos Aires, informing him that the Spanish government of that time

756

had requisitioned the ship, and directing him to put in to Vera Cruz, which he did, arriving on December 30th, 1936. Garcia and Diaz, two Spanish citizens, owned all the shares of both corporations; they heard of the reported requisition on the 19th and radiographed the master on the 23rd; he answered on the 24th that the ship was sailing under government orders; and on the 26th he repudiated their directions altogether. They had been in communication with the respondent before this, and on the 28th Garcia asked it to find out from the Spanish ambassador at Washington—via the State Department—whither the ship was bound. Neither of the two could get this information directly, because they were both of the Nationalist, or Franco, party, and were regarded as rebels by the Spanish government; and the State Department would not take up their case, because they were aliens. The respondent did ask the State Department on the 24th to protest on its behalf to the Spanish ambassador, and on the 30th the Department wired that that government would guarantee the safety of the cargo. The respondent continued thereafter to correspond with various Spanish officials through the State Department, and on January 6th, 1937, it chartered three small vessels which carried the cargo to destination—one delivered at New Orleans. On the 7th the Spanish authorities deposited $25,000 to the respondent's order in New York, and about $41,000 later. The decree confiscating the ship had declared that the government would assume all the ship's obligations; and it is to be understood that these payments were in discharge of that undertaking.

■ On the 30th Garcia and Diaz wrote to the respondent claiming their lien on the cargo for freight and protesting against payment to anyone else. The respondent did not receive this till January 4th, but the libellant's witnesses declared that its contents were disclosed to Siddall for the respondent at an interview on the 31st. What then took place is in dispute; we accept the conclusions of the judge who heard all the witnesses. He found "that Garcia and Diaz knew that they could not themselves do anything effective because of their Spanish citizenship and Nationalist (Franco) sympathies, and the necessity of dealing with the Spanish Loyalist Government; that they then proposed that respondent coöperate and take over the burden of arranging for transshipment of the

cargo to New York", that it should collect from that government its expenses of transshipment, pay the libellant its freight and keep the rest. "The extent of the libellant's offer of coöperation was that respondent assist libellant in collecting its freight out of any claim that might be asserted by respondent against the Spanish Loyalist Government. Libellant did not indicate any purpose on its part to furnish transportation for the cargo from Vera Cruz to New York". The judge did not find that Garcia and Diaz directly refused to go on with the contract, and it is exceedingly unlikely that they did. Nor did he expressly find that they told the respondent that they were unable to go on, though he probably meant as much; in any event Diaz testified that he had told the respondent's lawyer at the interview "that I did not think we could get hold of the linseed because they would not give it to us". There was not the slightest reason to suppose that the Spanish authorities would do so; the very purpose of the requisition was to end any interest of Garcia and Diaz in the ship and its ventures. Thus, on any showing the libellant never proved even its ability to get possession of the cargo, or to forward it, to say nothing of actually doing either. On the contrary it was the respondent that did both by means of the three vessels which it chartered on January 6th, 1937. The direct cost of transportation from Vera Cruz appears to have been about $40,000.

■ It is to be noted that the libel was not for breach of contract, and indeed the libellant could not have recovered any damages if it had been, for the costs of forwarding from Vera Cruz were greater than the whole freight. Its position is, and must be, that it performed in full, for it was not entitled to freight pro rata itineris. Since it did not in fact perform, it must rely upon the performance of another; that is, it must show that the respondent's performance was in some way in its behalf. Its theory, as we understand it, is that the respondent was throughout acting as an agent of the Spanish government, as was evidenced, not only by the correspondence between them, but by the payments which reïmbursed it. The Spanish government undertook the performance and carried it through because by the decree of confiscation it had assumed the ship's obligations, of which this was apparently the only one. Though the carriage was com-

pleted primarily in the respondent's interest, nevertheless it was completed, and that fulfilled the condition of its promise to pay the libellant, of which it had never been divested. This reasoning is ingenious, but fallacious. It is true that the carriage was completed, but not by the libellant; the condition upon the respondent's promise was not merely performance, but performance by the promisee. True, another might perform on the promisee's behalf and he might ratify it but the Spanish government did not perform upon the libellant's behalf; it regarded Garcia and Diaz as rebels to its rightful authority. The decree meant to protect others, but not them. Had the ship been chartered to another, that would not have been true, the charterer's rights would also have been protected, but the corporate paraphernalia that existed was merely a screen; Garcia and Diaz, sub nomine Linea Sud-Americana, Inc., were quite as little personae gratae as Garcia and Diaz, sub nomine Compania Española Navegacion Maritima S. A. Since the performance was not on their behalf, Garcia and Diaz could not therefore ratify it, and they remained as they had been, as soon as the master refused further obedience to their orders, excluded from any control or interest in the vessel and unable to complete the contract.

The doctrine debated in The Eliza Lines, 199 U.S. 119, 26 S.Ct. 8, 50 L.Ed. 115, 4 Ann.Cas. 406, and Bradley v. Newsom, L.R. [1919] App.Cas. 16, has, therefore, nothing to do with the case. In each of these a ship was abandoned by her crew upon the high seas, because she was thought to be a derelict. She proved not to be, and salvors brought her, in one case to destination, in the other to a port of refuge whence she could prosecute her voyage. The question was whether she had been abandoned in the sense that the owner could not assert a privilege to ratify the acts of the salvor as performance of the contract of carriage. It is not necessary for us to decide how far we might now defer to the authority of the later decision, because of the desirability of conforming to the British law in matters maritime. A salvor takes possession of an abandoned ship and brings her to a place of safety, in the interest of all whom it may concern; of the owner and of the charterer, as well as of the cargo. Ceteris paribus, any one of these may ratify any of the salvor's acts, because that was the salvor's purpose; as it was not here the purpose of the Spanish government. Nor can we see anything relevant in Owens v. Breitung, 2 Cir., 270 F. 190 since it was there understood from the outset that the cotton should be carried forward as much for the owner as for the shipper. Hubbell v. Great Western Insurance Co., 74 N.Y. 246, at page 263 states the principle as we understand it: "persons claiming to act as salvors, perform acts which the shipowner had the right to perform for his own benefit, he can ratify and adopt those acts and thus entitle himself to the benefit of them". The same is true of Hughes v. Sun Mutual Insurance Co., 100 N.Y. 58, 2 N.E. 901, 3 N.E. 71, likewise a salvage case.

There is nothing unjust in the result, except as it may be unjust not to allow freight to be recovered pro rata itineris. If the respondent holds any money unjustly, it is because the Spanish government paid it more than its actual loss. The direct cost of forwarding the cargo was, as we said, about $40,000; since the respondent paid no part of the freight—$36,000—its direct out of pocket loss was apparently only $4,000. Since it received from the Spanish authorities in all about $66,000, it applied about $62,000 to its alleged indirect losses arising from detention. We have no occasion to consider how real these were, or whether the Spanish authorities were ill-advised in recognizing its claim for them, for it was a matter in which the libellant had no concern whatever. If anyone has a claim against the respondent it is the Nationalist government which succeeded to the rights of the one then in power.

Decree affirmed.